and we're going to start with the first case which is 22-8002 Henry v. Ross Ms. Murphy for the appellant. You may proceed when you are ready. May it please the court, I'm Anne Murphy representing Bradley Ross and Maren Murphy. I'm going to try to reserve some time for rebuttal but we'll see how that goes. Mr. Ross and Mr. Azizian did exactly what law enforcement officers should do in the standard police safety procedures when they were conducting an investigative stop of a vehicle in a situation in which the safety procedures were warranted. They didn't violate the Fourth Amendment, let alone clearly established law. There are two legal criteria that are required for an investigative stop of a vehicle using forceful measures. The first is that the officers have to have reasonable suspicion that justifies them in stopping the vehicle. And the second is that the scope of the stop has to be reasonable so that once they've made the stop they use appropriate measures. Ross and Azizian had ample reason to stop the car. According to the complaint, and I'm going to read here so that there's no question about the words used, the Park Service, Ross and Azizian's employer, had caused a report to circulate that the murder suspect Bullinger, that's the man who had shot and killed three people and gone on the run, had been seen traveling in a white Toyota passenger car and it gave the license plate number. Did the report say that there'd been a shooting? No, Your Honor, but the man was, Mr. Bullinger was known to have shot and killed three people and gone on the run. And so what the report says, according to the complaint, is the murder suspect Bullinger. So they would have known that it was the person who did that. The reason I'm asking the question is whether your clients knew when making the stop that a gun had been used by the... I think so. So the complaint alleges that everyone was in a state of high alert over this particular murder suspect. And we know from background information that this man had in fact shot and killed three people. And I think it's reasonable to infer from that that they would have, and the report says the murder suspect Bullinger, so it is that person. So I think it's reasonable to assume that they knew that the person had used a gun. Is there any reason for them to suspect that the suspected shooter had accomplices or passengers with him? No, there wasn't anything in the report about that, but they wouldn't know. Like when they don't know that this isn't Bullinger, and in fact all the information would lead them to believe that the person in the car who exactly matched the description that they had been given of a gentleman who was white, who had whitish hair, was actually the murder suspect. So when they see at least another passenger, and the complaint doesn't allege it, but possibly they're aware of a child, those are really wild cards for them. They wouldn't know who those people were. They could be hostages, they could be accomplices, they could be anyone. And so the police still have to make sure that the scene is secure, because their best information, and their reliable information, is that the driver of the car is the fugitive murderer. Let's, you know, let's agree for now that there was reasonable suspicion for an investigative stop in this case. But the stop, but the investigation, as I read the complaint, went about 50, 51 minutes. Is that right? It was longer than that, Your Honor, because once the rangers had stopped the car, they had to wait for reinforcements to come in. It's important to understand in the case... How long was the entire encounter? The entire encounter was like 52 minutes. Okay. So there was a period for about half an hour, I think, where the car was stopped, and the rangers were waiting for backup. There are two rangers, and then maybe some more rangers appear. But when they're stopping the car and using these standard precautions, among the standard precautions are that they're going to remove the driver and the passenger from the car before they complete the investigation. And under the Supreme Court cases, Mims and Wilson, and this court's case, Garul, those are entirely legitimate safety procedures that the officers can undertake before they finish their investigation in this circumstance. Wouldn't you agree, though, at some point the officers had collected sufficient information through the course of the stop where they could no longer reasonably believe that the Hemrys were suspects in the crime, and that therefore the reasonable suspicions the lower court found evolved into not just an investigation, but a detention slash arrest? And here, especially after the officers had secured the Hemrys in the police vehicles, at that point, a quick check of their identification would have alleviated any suspicions with them, yet it still took another 20 minutes, half hour? Yeah, I'm not sure that's correct. I think the complaint alleges that once the Hemrys were secured, it was a relatively quick process. Yeah, I thought once they showed them ID, that they then apologized and turned them loose. Right, and I don't think the allegations of delay relate to the period after the Hemrys have been secured. And in fact, the complaint says once the backup police officers arrive from Cody, it says soon after that, they then start extracting the passengers, making sure that everything's safe. Because I think that after that, the police did act with diligence, because you're correct, Your Honor. Once the scene is secure and they're able to investigate, then they need to investigate. But that's exactly what they did. The delay and the time was really waiting for the people to come from Cody because it's a long time away. I don't believe there's an allegation of a lengthy delay. Well, I'm reading paragraph 35 that says, and 36, that for about a half hour, the Hemrys were in separate patrol vehicles and had not been asked to display identification. Well, Your Honor, I think that's... I'm not that sure that's actually consistent with the timeline, because I think the timeline is based on all the complaints, not entirely consistent internally. But I think the timeline is that they wait for about half an hour for the police to come from Cody, which is entirely reasonable. Then they have enough people to perform the stop procedures that include taking the people from the vehicles. That takes about 20 minutes. And then they let them go, because the timeline runs from about 10 to 10.52. So I think if you add all the parts of the complaint up, I think the actual, it's like half an hour waiting for the cops to come from Cody, and about 20 minutes putting everybody in the separate patrol cars, checking the verification and finishing the stop. Well, could we just... Matching the timeline to putting them in the patrol cars, they were handcuffed, they were put in separate patrol cars. Correct. The complaint, at least in paragraph 35, says that they were in the separate patrol cars for another half hour. It does allege that, Your Honor, but I'm not sure that that's actually consistent with the other elements of the complaint or what the district court found. And I think it may have been clarified in briefing. I have a little timeline here. Yeah, according to the complaint, that they allege at 10 o'clock they get into the campground. At 10.21, the first park county sheriff arrives. At 10.30, the second park county sheriff arrives. This is all in the beginning parts of the facts common to all complaints. So, we're going to be in around allegations 21, 22, that kind of thing. At 10.30, the second sheriff arrives, and then at 10.52, the incident ended. So, I think the complaint doesn't all necessarily hang together in terms of the allegations that are made. My understanding is that the timeline does not, in fact, include the 30 minutes that's alleged. Let me just ask about the next paragraph. It says after about half an hour of detention at gunpoint, were the hemorrhies held at gunpoint after they were placed in the patrol cars and handcuffed? Is that what the complaint alleges? I believe that the half hour of detention at gunpoint is the hour in the car, because the complaint alleges that they trained guns on the car, and I know the complaint says they train guns on the people in the car, but really, what it alleges is they trained... Well, no, I understand that the guns trained on the car. I'm asking about after they were removed from the car and placed in the separate patrol cars, were they still held at gunpoint? The complaint alleged that, and do we have to accept that as true for purposes of the procedural posture of this case? I think that in paragraph 36, we're talking about the hour of detention at gunpoint. I mean, if it's 52 minutes and the complaint's alleging an hour of gunpoint, then it seems like they were held at gunpoint the whole time. I'm not quite sure what the answer to that is, but I'm assuming that... Well, doesn't that go to whether there was excessive force used here? You're honest. If we look at the cases, the use of guns and controls is reasonable when there's a reasonable and is it reasonable when the individual is handcuffed, placed in a patrol car, and there's still guns trained on that person, is that reasonable? Where's the threat at that point? Well, the other thing is that the complaint might still be alleging, because what the complaint alleges is that the adult hemorrhoids are handcuffed and taken to the patrol cars, and that the car is still held at gunpoint. So, it could be talking about that, and that is completely legitimate, because the officers, until it's safe to approach the car and make sure that there's nobody hiding in the car or that the car is safe, then they can still use guns. It sounds like there's a lot of maybes on how we should read the complaint, and it's important, in terms of resolving these issues, to have an understanding of what is being alleged and what we have to assume is true, and it seems like the complaint's inconsistent. Maybe it means this, maybe it means that. I'm just not hearing... I understand that, but it's also true. I mean, I'm representing a law enforcement official suit in their individual capacities. It's also true that if the complaint alleges a timeline that says, at this time this happened, at this time this happened, at this time this happened, and then there's like this general allegation, and then we were held at gunpoint for an hour, that really doesn't fit with the factual allegations. If that's enough to keep from having clearly established law based on the use of reasonable procedures and a whole host of cases from this court and the Supreme Court that suggest that these procedures were reasonable, it's just encouraging bad complaint writing. But the starting point for our analysis is the factual predicate for the application of those cases. Right now, that doesn't seem like you're being very clear on what it is. I understand that, Your Honor, but I would just, I mean, the complaint also says it's at 10 p.m. It also says, you know, I mean, there's various things in the complaint that are manifestly not true. And so I understand that we have to start with the factual allegations on the complaint, but I would urge this court, from the perspective of my clients, to the extent that the complaint doesn't add up and that it alleges things that seem not to be correct or that are ambiguous in terms of maybe the guns were still pointed at the gun and not still at the hemorrhage, that this court not maintain the lawsuit on the basis of a complaint that doesn't really hang together very well. Anyway, I see that my time is almost up. This court's cases and the Supreme Court's cases are extremely clear that if a law enforcement officer, sorry, my time is up. Please serve us. Thank you. Thank you much. Let's hear from Mr. Moxley. Good morning, honorable members of the court, counsel, police, court. I'm Robert Moxley from Cheyenne. I represent the Henry family who were terrorized by the appellants, Rangers Ross and Azizian on the 17th of July of 2017. Can you raise your microphone up a little bit? Yes. Thank you. Thank you. I urge the court to uphold Judge Johnson in this matter. I believe that plaintiffs in this case very thoroughly satisfied the test for for defeating qualified immunity. I don't think there's the slightest question, but constitutional rights are involved when people lose their freedom. And I believe that there is both a very generalized definition of clearly settled law that satisfies the test for defeating qualified immunity. And I believe there's a very specific set of cases that also satisfy that test. You don't quarrel that the the law enforcement was justified in making an investigative stop here, initiating the investigation, do you? Well, I believe at the very outset, probably so. I mean, this is a motion to dismiss case, and so there's no facts at all. But the situation was that somebody said they had spotted this fugitive. The huge body of law that governs probable cause, of course, requires probable cause to be a verifiable thing. We don't know if this is a, we don't know who the informant was. We don't know what the informant said. We don't know if they asked. Well, that's the nature of a terrorist stop. An investigative stop is to gather additional information. Yes. And if the stop was justified at its inception, which I think you've conceded, at what point did this investigation go off the rails? Just almost immediately. The real central rule of Terry that applies to this case is that officers who initiate a Terry detention are required to diligently pursue a means of investigation that is likely to confirm or dispel the reasonable suspicion that led to the stop in the first place. So that when they're shot dead laying on the ground because they walked up and just walked into it, it's just the way it goes, right? I'm not sure I understand. Well, you say that they have to do some stuff immediately if they turn. Well, they stop. They have to do something. It seems to me that we're always doing officers safety after the fact. And when they're lying dead on the ground, then somebody says, well, maybe they should have taken their guns out. And this is a triple murderer, supposedly. And I don't know what more you could expect that they're going to run up to the car to say, are you the triple murderer? Well, I understand that it's not exactly appropriate for us to second guess what they did, but I think it's very appropriate for us to seriously question the fact that they did nothing. Well, what would you have them do? Two park rangers. They're not really the... They had a license plate number of the Henry's vehicle. They didn't know what state it was from. Well, they were told it was a white pickup or a white vehicle. A white SUV, white Toyota SUV. They had the right license plate number and they had a person say, I saw this triple murderer in the car. And I mean, to say, okay, I'll walk up to him and say, hey, are you the triple murderer? Well, that's not what I would suggest they do, but I would suggest... It sounds like it. The course that was taken in the case that Judge Johnson mostly relied on, which is Maresca versus Bernalillo. I'm very familiar with that case. Yes. Maresca, the way they found the discrepancy between their... Well, in that case, the police officer transposed the numbers. Right. And they knew that it was not, or she should have known, it was not the car that was described. And they did it anyway. Exactly. So it's a little bit different. Well, the thing that the officers did to find their mistake in Maresca County was something that didn't expose them to any danger at all. They ran the license plate again. Running the license... The appellant's brief admits that they waited 30 minutes before trying to identify the Henry family. And here they had a vehicle with a license plate, a Missouri license plate, right there in front of them that they could have called in and found out who they were. What would that have done if the guy had stolen the car? Somebody identified the individual as the triple murderer. That's step one. Certainly, something could have been done in that 30 minutes of delay to keep this from becoming the terrorization of the Henry family that it was. Let me test that a little bit because I started off this colloquy because we're trying to decide the reasonableness of the stop and the reasonableness of the conduct of the officers at this stop. And I think you've agreed that the stop was reasonable. Would you agree with me that the officers having weapons drawn at the Henry's, would you agree with me that that was reasonable at the commencement? I don't believe it was reasonable to point guns more than a half a minute. They told Mr. Henry to throw the keys out of the car so they were communicating with him. He rolled down the window and threw the keys out the car. They could have asked him who he was. They could have done something to start an investigation. There's no way to know under this fact situation how long the reasonable detention would have been. But obviously, the detention that occurred was poorly unreasonable. We have to decide whether. I'm sorry. That's the question in this case is whether the length of the stop was reasonable in the circumstances. Basically, you're saying the test of reasonableness that you're advocating is after Mr. Henry threw the keys out the car, that at that point, that's where this thing went off the rails. Well, there are questions of fact in this case. This is a motion to dismiss case and we can't really determine those things. But we can say that when they do nothing and when they're outside of their jurisdiction. I mean, they weren't even law enforcement officers in this place. Were they really doing nothing? Took place. I'm sorry. Were they really doing nothing? I still didn't hear you. I'm sorry. Were the officers really doing nothing during that period of time? I believe so. Yes. That's what the Henry family believes. I thought the complaint was out of misinterpretation. Well, it was broad daylight, Your Honor. And there was a little girl, a seven-year-old girl wearing a tank top in the car. There was a woman in the car. The concern for officer safety here is a red herring because there was all kinds of ways to develop evidence that would cast doubt on the reasonable suspicion itself with regard to Mr. Henry. And in fact, there was no reasonable suspicion whatsoever with regard to Mrs. Henry and the little girl because... We're not dealing with the little girl, though, at this point. I'm sorry? We're not dealing with the little girl at this point. I understand that. But the situation that was confronted by the officers was one where they had a duty to comply with the law. If this had been a 30-minute stop instead of a 52-minute stop, same facts, other than the stop ended earlier, would we be here? No. That would have been reasonable. If it had been three minutes? 30. 30. Oh, no. No, I thought you said three. I'm sorry. 30 minutes would not be reasonable under these facts. There wasn't anything reasonable about this after the police, these officers decided not to do anything after making the stop. Well, they called for backup, so they didn't do not anything. I believe they called for backup before the... Backup came in after they stopped the car. Right. But I believe they called for backup before they made the stop. No, I don't. Well, maybe they did. I don't know. I'm sure they did. Because they had no idea at the time they made the initial stop. Was it only backup, though? I mean, wasn't the... Didn't the sheriff's department have sort of lead jurisdiction here? I mean, these are Park Service law enforcement officers. Right. The backup they called were Park County deputies. I mean, it was in Park County. Yeah. And so I guess the question... We're back to this reasonableness question. So here are the park... Here are these two park rangers, but at the end of the day, this is really the sheriff's case. And so they're sort of holding the scene for the sheriff's folks to get there. Why isn't that a reasonable decision on the part of... It's... The law is absolutely clear that it's unreasonable to point long guns at a little kid for 30 minutes. We're not talking about the daughter. Okay. Okay. We're talking about Ms. Henry and Mr. Henry. Okay. And we're talking about a suspect in a triple homicide. There could have been guns in the car. Wouldn't that be reasonable suspicion to hold them? If what? There could have been guns in the car, given that we're talking about the No. No. The fact that something could theoretically be a fact is not... Why isn't it reasonable, given that they're investigating a triple homicide, to think that there are guns in the car? Why isn't that reasonable? It might have been reasonable at the outset, but by doing nothing, the entire thing was rendered unreasonable during the application of deadly force. What's your clearly established law case? What's your best case? Well, Maresca and McCauley v. Cortez are both very established law. I submit that there are thousands of Terry cases and thousands of cases that relate to the issue of probable cause that would have a strong influence on the actions of a reasonable and competent police officer. I believe that the thrust of Harlow v. Fitzgerald and Callahan, there's numerous cases that talk about the standard being either a clear violation of the law or plainly incompetent police officers. You don't find cases about plainly incompetent police officers, but in the context of this case, in the review of a decision on a motion denying a motion to dismiss, I believe that the plainly incompetent police officer standard is very much in play here because they could have done anything to ameliorate this situation. They were constantly in perception of circumstances that mitigated their suspicion. They required my clients to sit in the car for 30 minutes with their hands pressed against the ceiling, which is painful. Can I just ask you though, you've got a false arrest claim, right? And you've got an excessive force claim. Yes. At what point, and this is as to Mrs. Henry, did the detention evolve into an arrest? Where on the timeline did it become an arrest? I believe very early. I believe that who is required to sit in their car incommunicado at gunpoint has been arrested. I don't believe that's an assertion to be very much challenged. I believe that in the context of a motion to dismiss, the fact that somebody is sitting in their car with their hands pressed against the ceiling of the car at gunpoint with long guns, I believe that person has been arrested. When did the excessive force commence then? I'm sorry? When did the officers first deploy excessive force? I believe they deployed excessive force within a minute or two of, I believe the force became excessive within a minute or two of the stop when they failed to do anything. And the district court did not apply the Graham factors in analyzing the excessive force claim. Do you have any comment on whether Graham supports your claims here? Very, very much. Because there was absolutely no imminent threat of danger to the police. That any threat of danger has to be imminent. Okay. Could I just ask you, does the complaint allege that the park rangers were pointing their guns at Mrs. Henry after she was handcuffed and placed in the patrol car? They did what? Were they pointing their guns at Mrs. Henry after she was handcuffed and placed in the patrol car? Does the complaint allege that? I don't know. I know that they pointed their guns. It's your complaint. What's that? Well, there's been no discovery. Well, did you allege that? Yes, we believe, yes, we believe that she was, that she was at least at gunpoint or in the shadow of gunpoint when she was in the other car. That's, we do believe that. Do you believe it or did you allege it in the complaint? Well, you know, obviously the facts of this case are going to be fleshed out with discovery and everything. And those facts will be pinned down. But I don't believe that that kind of inquiry in the review of the denial of the motion to dismiss is really in the scope of this proceeding because I believe that the standard of review very, very much allows Judge Johnson to draw all of the inferences from the complaint. Thank you, Counselor. Your time's expired. Your excused and the case shall be submitted.